Good morning. Good morning. May it please the court. Casey Youngentag for objectors, Ryan Tomlinson and Carol Richardson. I'd like to reserve eight minutes for rebuttals, if that's okay. Very well. If you could keep track of your time, and just for reference, if you'd like to address Judge Bull, there's a camera on this side, just so that you know. Okay, thank you. All right, Scott, go ahead. Objectors are class representatives for a certified class in Missouri State Court. Like plaintiffs, objectors base their claims on Monsanto's failure to warn about cancer risk. But unlike plaintiffs, objectors experienced substantial success in the state courts. Besides class certification, Monsanto never even moved to dismiss their claims. By contrast, Gilmore's litigation strategy was a failure. None of their cases made it past the motion to dismiss stage, and because Gilmore lacked standing himself, he faces certain to be granted motion to dismiss. This nationwide settlement resolves all of the consumer claims against Monsanto for $23 million. Monsanto and Gilmore Council are this nuisance settlement's biggest winners. Under Gilmore's counsel's damages calculation, Monsanto extinguishes almost a billion dollars of liability for a penny out of its pocket. How is that different than the Missouri? Actually, because I presume that that's what you're indicating should have been resolved there. So, in the Missouri case, they are certified. Thus, they can pursue class-wide relief and have common benefits settlement. As I understand, it's only a class of Missouri people. That's correct. But by this court's precedent, just because the class is smaller than the rest of the whole, it still needs to be factored into any settlement. And as I also understand, there hasn't been a merits challenge in your case, but the class was certified. That's correct, Your Honor. Monsanto... I understand if I'm looking at the measure of damages, the measure of damages for Missouri claims are, according to the district court, similar to the same measure of damages in other states as a bargain, as the benefit of the bargain is the standard for the measure of damages. And the district court said Delaware was the case they were really focused... he was really focused on. Correct? Yes, Your Honor. There's two things, though. The first is that under Missouri law, benefit of the bargain damages, it's easier to get full refund relief. Well, the district court suggests quite the opposite. I'm reading the district court's order, and he says, no, that isn't it at all. So, tell me why he's wrong. So, I think a clear reading of Missouri precedent, including Scott v. Blue Springs Forward Company, indicates that you can get full refund based on a class member's declaration alone that there was no benefit. And secondarily, and more importantly, this settlement results in most Missouri class members getting absolutely nothing because it was a claims-made settlement. By contrast, if we were allowed to litigate our claim in Missouri State Court, we would be able to recover a judgment as to everyone for a hundred percent of their damages. One thing that worried me about the Missouri case was what it alleges. And it doesn't seem to allege the same broad factors that would be alleged in these other cases. In the Missouri case, it was an allegation for personal family or household use. And yet, I guess the court looked at, and I tried to look at, whether personal family or household use under Missouri Merchandising Practice Act would cover agricultural, industrial, and professional uses. Because as I understand the Missouri Merchandising Practices Act, it only allows for recovery for purchases made primarily for personal, family, or household purposes. Yes, Your Honor, there's two things there as well. The first is, even if the class is overbroad, it certainly covers the roundup purchases by Missouri consumers for household use, for general household use. And secondarily, there is interpretations of the regulation, I believe by the Attorney General, saying that the statute covers those. I can't really rely on the Attorney General for much, can I? I mean, I've never relied on the Attorney General for much, so I guess I'm trying to figure out why I'd start now. Yes, Your Honor, but under the Missouri statute, the Attorney General is allowed to issue regulations in terms of the MMPA, and that's why his thoughts have some weight there. Okay. And as I understand it, in the case brought against Monsanto by Gilmore et al., there have been experts, but you don't have an expert yet. So, Your Honor, there was an expert in their case, in a case that was dismissed. Two experts, Monsanto had one, so did plaintiffs. Correct. Sorry, Gilmore plaintiffs had an expert from a case that was dismissed at ESCURA that only dealt with Florida purchases. And separately, in Missouri State Court, you're incentivized to move for class certification as soon as possible, and not to mention, plaintiffs can meet their burden of proof of damages based on the testimony of class reps alone. I guess I'm trying to figure out, there was no question you knew about the settlement agreement before you even moved for the class. Why did you go to the extra added work to move for the class? Was it just so you'd have a better argument here? I mean, I didn't understand why, when you're representing people and taking their money, and you know there's been a settlement, you know you're going to fight about that, you'd go after it afterwards. Your Honor, we didn't know about the settlement. They did not announce the settlement until June of 2021. Our class was certified in March of 2021. Okay. And in fact- Well, I'll talk to them about that, because I got the idea that's not what happened. Your Honor, in fact, Monsanto hid the settlement from the state courts, you know, never told them, despite- Hid is a big word. I'm not sure. I mean, as soon as, didn't they ask, as soon as they knew there might be a settlement, didn't they give notice? Isn't that how you got involved? They did not, Your Honor. In fact, their conduct stands in stark contrast to what they've done in other cases like Rawah, where they immediately told the court about some punitive settlement that they reached. By contrast here, they did not tell the Missouri courts at all while actively trying to overturn the class certification. So explain to me then, because I thought the mediator was selected. Is that correct? And you were aware of that? We were not aware of it. It was not announced on this docket for this case. They announced it on Escura, which was dismissed, and then never re-noticed that they were having mediation. Well, I have my facts wrong. I have here that February the 16th, there was a mediation. That's correct, Your Honor. And that there was a settlement agreement on June the 10th. That's correct. And that after that, they immediately gave notice of the settlement. Correct, but our class was certified in March of 2011. I understand now why you're saying March. I can understand now what you're suggesting. Okay. And I guess I wasn't clear on that fact that they had announced in, you said, Escura? Yes, Your Honor. And that had been dismissed at that point? Yes, Your Honor. So was there any ability for you to know? There was none, Your Honor. Basically, on Escura, the case noticed that they were mediating with Judge Welch. That case was subsequently dismissed, and they never re-noticed that they were having mediation. So even when they selected the mediator, they never, they were, the case, how can they, I guess, procedurally, I guess I'm trying to understand, how could they have appointed a mediator in a case that was dismissed? Yes, sorry, Your Honor. So before Escura was dismissed, that's when they noticed the mediator. Okay, so there was notice of a mediator before it was dismissed. And then it was dismissed. Okay, when the notice of the mediator went out, you were aware of that? We were not aware of that, Your Honor. But even subsequently, when they filed Gilmore, they never re-noticed that they were mediating with Judge Welch. Oh, okay. And there was a separate plaintiff as well. I want to talk about then what the district court ordered. You got 10 minutes left. I'm a standard review man. Yes, Your Honor. I mean, I have a tough time getting past the standard review. Give you a little background, I was a DJ. And I frankly didn't like this Ninth Circuit telling me what to do when they didn't know what was going on in the courtroom. So I'm a big standard review guy. And it seems to me that the standard review here is pretty hard, pretty difficult for you. The court, I mean, if I read Kellogg, this court will rarely overturn unless the terms contain convincing indications that self-interest rather than class interest, in fact, influence the outcome. And I've got others. Rarely disturb the decision to prove the class. My ability to review is extremely limited. As a DJ, I love that. I put that in every order I did so I could send it up and nobody like these good colleagues I have could undo me. Well, so then I look at what we're going to look at. You have many times alleged the same kind of arguments about this particular situation. The disproportionate distribution, the clear sailing agreement arrangement, the fees not be reverted to the defendants. Each time this has come up, and it's come up three times, the district court has heard your arguments and has ruled against you. And then I got the order that the district court put together. He applied the Bluetooth standard. He said it didn't work. It isn't like he didn't say there isn't a Bluetooth standard. He said, I know of it. Now I know of it. Frankly, I looked at everything he looked at. And your argument seems to be he should have said more. I mean, that seems to be your argument. We'd like to have him talk more. Well, I don't think that's in any of these things that I look at. So I'm trying to figure out if he applied the correct legal standard and it isn't clearly erroneous, then I can't get over it. Yes, Your Honor. But under this court's clear precedent, including two opinions written by Judge Gould, if they do not substantively investigate those Bluetooth factors, it is clear error and an abuse of discretion. So we're talking about substantive investigation. You have to investigate and address. So for example, sorry, Your Honor. Go ahead. I didn't mean to interrupt. Sorry. In Allen v. Padola, for example, the court said, I've looked at these and I find that there is no collusion, which is exactly what the court did here. In McKinney-Droveness, the court did the same thing. In fact, it went beyond this court and said, I do see there's a clear sailing arrangement. And I also see the fact that... Where's the evidence of collusion? So the Bluetooth factors are, on their face, evidence of collusion. That's what the court has said since Bluetooth in a long strain of precedent, Your Honor. Oh, just the timing. I just want to make sure I understand this part of your argument, because I'm trying to understand the collusion argument. So you're saying that just by the mere fact of the timing of it all? Yes, I think it's because of the certification. So not just that, but the fact that these factors are present in this settlement. In fact, the court has described it as a way to smoke out collusion, which is why the court needs to really address and... It needs to understand whether or not these terms are in the class's best interest. And to your point, I guess I just also want to understand, you're making the argument that we had no notice. We didn't know about this. Were those arguments made to Judge Chabria before? Yes, Your Honor. And what did Judge Chabria say about those arguments? I don't believe he ever addressed them specifically. Okay. I'm sorry, Your Honor. I'm having trouble about the investigation. I don't know what you're really trying to say. Because I'm kind of like my colleague here, I don't think there's any direct evidence of collusion anyplace in this case. The only way you're going to get to collusion is you're going to say, well, we got three factors and that says there's collusion. And then that whole effort was rigorously debated at the beginning of the attempt to intervene. It was rigorously debated when they sought discovery. It was rigorously debated ending with the objections to the settlement. And at the culmination of the approval hearing, how much more investigation does the district judge need to do? They can't go out and make their own investigation. It's got to be something that you bring to them, that they review, that they look at. And they did four different times the same things. Your Honor, nobody is debating that the parties vigorously disputed the presence of the Bluetooth factors. The problem is that the district court did not investigate those factors. And substantive factors... What does that mean? I'll give you a guess. Four times he heard him. Four times he asked questions about him. Four times he had you think about him. Four times he gave you the privilege to say whatever you wanted to say. That seems to me investigation. No, Your Honor. For example, in McKinney... On where do you say investigation isn't that? What case tells me that? For example... A lot of Judge Gould's cases say that. Your Honor, in McKinney-Drobeness, the court, for example, said if I cut fees, there will be a reversion. But the judge never explained why that reversion would be in the benefits of the class. And because he never explained, the court said it was a per se abuse of discretion. So that's what I mean by investigate and address. The court needs to look at each of these Bluetooth factors and say... What would you want? Let me ask you this way. Again, I'm just trying to understand. What would an investigation under your theory be in this case? I mean, what would Judge Charbiot need to have done? So he would have to go step by step and say the clear sailing agreement is to the benefit of the class because Y. Or it is not in the disinterest of the class for X or Y reason. And he would have to go through each of these factors and explain why they're in the benefit of the class. This has been the through line through Rose, through McKinney-Droveness, through Allen v. Bedolla. At each time a class council brings forward a settlement with all three of these signs, this court has demanded that the district court explain why those factors are to the benefit of the class. You're beyond your time, but I'm going to ask Judge Gould if he has any questions at this time. And maybe why don't you reserve your time and then we can come back to any questions that Judge Gould might have. Yes, Your Honor. Thank you very much. Good morning. Good morning. I'm going to go through the session instructions, organize them in a minute. And may it please the court, Julian Wade on behalf of the settlement class and plaintiffs, Scott Dunmore, James Weeks, Paul Taylor, Sherry Hanna, Amanda Boyad, Juliana Escura, Anthony Jewell, and Christy Williams. And I just want to start this by saying the issue that is raised on appeal here is whether the district court abused its discretion in finally approving the settlement. And the district court, in doing so, reviewed all of the Bluetooth factors. One of their arguments, I guess I take, is that the district court abused its discretion in not providing a process, I guess, in getting notice and that it seems to have been coerced. This, the way in which, I guess, the settlement was sort of obtained and the way in which mediation was filed in the separate case and not informed of everyone. I guess that's what they're, today that seems to be what they're arguing. I agree with you on that. And the, first I just want to clarify what actually occurred. A recurring theme with this appeal is ignoring the record. And it has occurred over and over again. There is no dispute that the record says what it says. And what the record says here and what happened in Escura is that a case was pending against Monsanto in Florida Federal Court. Julio Escura, who is a plaintiff now in this settlement and in this case, as part of this case, had his own case against Monsanto. And that case was on a so-called rocket docket. A lot of litigation occurred in a relatively short amount of time. It was set for trial. Classification motion was due. It was fully prepared and was done. But the case ended up getting dismissed on the day before the business, it was on a Friday before the plaintiff's deposition was supposed to occur. And leading up to all of those factors, one of the things that the district court ordered us to do was to appoint a mediator and file that with the court. So during the course of the Escura litigation, that occurred and Judge Welsh was selected as the mediator. That case was dismissed. It is fully briefed on appeal at the 11th Circuit awaiting a hearing date pending the outcome of whether this case gets finally approved. And after Escura was dismissed, Scott Gilmore filed a case in Delaware. And then it was that case that ultimately settled after a couple rounds of pleadings challenges that were not ever decided. They would have had notice of? Certainly of what happened in Escura. That was public record. It was on PACER. And going back to your question about, I suppose, the process or the thoroughness of the court's investigation or order, of course, the court went through all of the Bluetooth factors exhaustively. It's not disputed that this was briefed 12 times. It is not disputed that the court went through the Bluetooth factors at the preliminary approval hearing. Those factors are addressed in the preliminary approval order. They are addressed in the final approval order. They were addressed at the final approval hearing. And the court does know 9th Circuit precedent does not mandate, as this court knows, a rigid formula of specific wording and analytical steps for a district court's written Bluetooth inquiry. The court doesn't have to go through and say, I'm looking at this factor, and this is this Bluetooth factor, and I'm rejecting it because, or I'm not rejecting it. And even when the Bluetooth factors exist, the case law doesn't say, that means the settlement's thrown out. That means the court has to apply heightened scrutiny as to those factors. And that is exactly what the court did. And in fact, it's not true that the court didn't consider the timing of the settlement negotiations. In fact, these are, in addition to analyzing the Bluetooth factors, the court also conducted a more searching inquiry on every issue that objectors claimed was probative of collusion. That includes the respective bargaining positions and the strength of the Missouri case. That was addressed at the preliminary approval hearing, in the preliminary approval order, the final approval hearing, and the final approval order. The court considered the settlement timeline as implicating a reverse option, which is essentially what they're suggesting, that was addressed in the preliminary approval order, the final approval hearing, and the final approval order. The extent of discovery was also considered during the final approval hearing and in the final approval order. And all these citations, by the way, are in our brief. Punitive damages were considered. I have a question for you, if I may. Of course, Your Honor. In this context, where class settlement was approved, we review that for abuse of discretion? Yes. And what's the rule of the clear error standard? Does there have to be a clear error? Yes, exactly, Your Honor. A district court abuses its discretion if it doesn't consider the facts of the case or commits a clear error in applying the law to the facts. And there is zero evidence that that occurred here. And in fact, there is no evidence that that occurred here. The court exhaustively considered every single issue the objectors asked the court to consider and applied it to the law. And it made a reasoned decision based on his experience in this case and overseeing the sprawling MDL personal injury cases at the same time. So the court is more than informed as to the issues in this case, the strengths and weaknesses of this case, and what would be an appropriate settlement under these circumstances. And there's certainly zero evidence of collusion. Thank you. It's also my understanding that the district court, in trying to make these determinations, diminished the plaintiffs or diminished the funds for the plaintiff's lawyers by almost half. That's correct, Your Honor. And the costs, they were also diminished. That's correct. And they also said that any funds not used would not be returned to Monsanto but would go to the claimants, correct? That's correct. Doesn't that take away relief from the third factor that is in the Bluetooth factors? Take away from it in what respect? In other words, doesn't that say that that did not happen? That's correct. And, you know, the time of evaluating the Bluetooth red flags, the court has to look at that at the time that the settlement negotiations take place and at preliminary approval. And that's exactly what the court did in assessing those factors. The court looked at the structure of the settlement, made a, agreed with counsel that a 2 to 6 percent claims rate assumption was reasonable under the circumstances, and because of that, felt that the fund was adequately, was sufficient between 23 and 45 million, just sort of a hybrid in that sense. And, of course, and it's exactly what happened here in considering the concept of a revorter, this was not, as counsel incorrectly stated earlier, this was not a pure claims made settlement by any means because of the 23 million dollar floor. It was arranged with a cap, so arguably between 23 and 45, that's a claims made scenario, but the 23 million was always going to be paid no matter what. And exactly what was possible here is what happened, which was when the attorney's fees were cut, the majority of that money, it's almost 4 million dollars, is going back to the class. And the class recovery is pro rata, you know, will be applied pro rata and will increase, I think it's almost 17 dollars on average per person in addition to the over 50 dollars average per person that claimants are receiving here. I understand that you wanted to reserve some time, but Judge Smith might have a question. I actually didn't want to reserve time, I just wanted to be notified so I don't go over. Just to make sure I understood, it seems to me that this settlement does not release personal injury claims, does not release any of the punitive damage claims that can arise from personal injury claims, it does not release attorney's fees that can arise from the personal injury claims, nor the medical monitoring claims, and that what it does, it gives them, which I understand 20 percent of their average retail price, which based on what the plaintiff's experts said, they would recover in any event. So they're getting two-thirds of what their expert, their best expert said, they would get in this particular case, on a benefit of the bargain case. That's exactly correct, everything you just said. And they can recover payments for products, notice costs, claims, administration expenses, incentive awards, all that. That's correct. And they cut back the attorney's fees as I've suggested. Yes, the attorney's fees, the costs, and the incentive awards were all reduced. I just want to make sure because that leads to whether this was an abuse of discretion on the district court's part. Judge Gould, did you have any questions at this time? No. All right. Any additional questions? All right. Thank you, counsel. Thank you very much. May it please the court. John Rosenthal for Monsanto. You and I would like to address two things quickly and in turn talk about a plaintiff's claim that somehow the Missouri plaintiffs were disadvantaged. The first two points I'd like to just address quickly is the standard of review and the fair and reasonableness of the settlement. On the standard of review, I'm a standard of review guy too. I may be a district court attorney. And here, this district judge did everything the Ninth Circuit asked him to do. He not only did it once, he did it three times. He spent an inordinate amount of time both reviewing pleadings as well as in hearings and addressing the very issues. They're saying that there should have been some more investigation of some sort? Yeah, I believe there was an investigation if you look at the record. But what they're really saying is that he can't just hear the hearing. He can't just ask him questions. He can't do that two or three times. What he's got to do is put it down on paper why this is this and this is that rather than just say the factors have been met. How do you respond? I would say what the Ninth Circuit has said, well, that would be preferable. That's not the standard. And Ashbrook versus Pueblo versus Wilkins in 2023. So you concede that the judge didn't do that? Didn't explain in that way? No, I concede in his opinion he references his findings on the Bluetooth. That references Bluetooth specifically. Right. In terms of laying out detailed findings, I think that is in the overall record. And what the Ninth Circuit said in 2023 is that's what we're going to look for. While it's preferable that the court lay it out in a written opinion, that's not the standard. The standard is what the court actually did through review of the actual record. And why is it preferable? I mean, I've really looked in here to find out what investigation means. And I'm having a tough time saying why I have to write out all this stuff just because I'm a DJ in order to have investigated. If I've had a hearing and I've asked all these questions and I've said, come on, give me some answers and they don't give me the answers I want. And it's obvious to me, why can't I just make my findings? Is there a case that says I can't? Even one of Judge Gould's cases, which I must follow. I know I must follow because he's on the Ninth Circuit. But I'm trying to say to myself, I'm a DJ. I'm trying to put these findings together. If I have those people in front of me and I'm asking all these questions and I'm trying to get to the end result and I make them, I put them under the gun. Why have I got to write down all that stuff on a piece of paper? I don't find that in any case, do I? I don't find it in any case either. It's just recently in 2023, the court said it was preferable, but not necessary and affirmed on appeal. So, turning to the second bill. I want you to turn to what about this Monsanto HID settlement negotiations. That's one thing they say. Well, they like to see a lot of things on this record. I know, but I wanted to respond because frankly what he told me, I had in mind what my record suggested. Tell me what happened. Well, if you give me a second here, what happened here? I'm trying to find a specific timeline. The appointment of the mediator in the Florida case. I mean, was that somehow hidden from them? And was there some notice provided? Well, there was not notice provided other than public notice available to anyone. Mr. Downey and Mr. Stuthi are very sophisticated class lawyers. I think they know how to review the record and were well aware based on my discussions with them that there were other cases and other plaintiffs out there. In terms of whether we had an obligation to do so, that's not the law within the circuit. Under Bellucci and Negrete, it's very clear that we do not have the obligation to try and negotiate with all other class plaintiffs that may be out there. So, they have to go on a search and rescue mission essentially through all of the cases throughout to try to find a mediator. I mean, is that what you're advocating should be what we require? No, I'm not advocating that. The question is from our perspective. Does the Ninth Circuit say we have the obligation to reach out to all of the potential class plaintiffs? We don't, right? We have the obligation to structure a fair and reasonable settlement. The Missouri plaintiffs here were never in consideration as a fair and reasonable negotiating partner. They brought a case in Missouri not focused on consumers like the plaintiff's case here. It was mainly focused on consumers plus farmers plus professionals, right? Well, massive scope. What they were trying to do was hold up a settlement for the much larger sales of agricultural sales. So, can I say as a general rule by looking at these pleadings that Monsanto complied with all settlement notice requirements related to the potential settlement? Yes, you can, Your Honor. All that have happened, in each court, what the situation was that you've complied with all of them? Yes, Your Honor. We provided even the settlement that was mediated by Judge Welsh? Yes, Your Honor. So, we... What were your obligations as to that particular settlement? Well, in terms of what we did, we negotiated a tentative settlement in front of Judge Welsh. It took several months to finalize that. Well, hold on. I think his question is different. What are your obligations? Not what you did. What are your obligations? My obligations are to come forward with the court and provide timely notice of the settlement. We did that on June 7th. Three days later, we moved before the Missouri court to state the matter, providing notice to the Missouri court that a settlement had been reached, and we planned to move for approval again in front of Delaware, that the Missouri court stated the matter. So, Counsel, I have a question, if I may. Could you explain to me your position as to why the settlement here was fair? Is it reasonable and adequate? Yes, Your Honor. When you look at these kinds of cases, this is a false advertising case, and when you look at similar cases, both within the circuit and outside the circuit, it's fair by any measures. The compensation rate here is 20% of the purchase price. The average person would receive $55, because you could recover during multiple years. When you look at what the plaintiff's own expert, it came to the conclusion that the settlement would have recovered two-thirds of what their best possible case was at trial. By any measure, and by various Ninth Circuit cases, that's more than an adequate and fair settlement. Compared with the risk they face and what our expert found, our expert found that essentially that there was no price premiums here, no damages, and at best, it might be 1.5%. So, what we're really looking at is what they would have paid if they'd have known about the carcinogens, right? If they'd known about how toxic your product was. What they would have paid. So, we're looking at the difference between what they paid and what they would have paid, and your expert said they'd have paid the same. Our expert said that there was no statistical difference between the comparable groups with and without a warning on the label. So, Your Honor, I would like to address this notion that somehow the Missouri plaintiff's were disadvantaged. If you look at the opinion by the district court, the court closely examined this, an objector is simply wrong. Full refund is not the standard in Missouri, and never was. This has been addressed multiple occasions by both Missouri state courts and Missouri federal courts. Phillips Morris in 2003, and in fact, also in the Jones case, a case that we had, another class case, the district court in 2021 expressly rejected the notion that full refund was the appropriate measure to damage. This is a price premium, and when you look at what the district court here, they looked at this and they said that essentially, the Missouri purchasers are in the exact same position, legally, and as a matter, this settlement did not disadvantage them in any way, shape, or form in terms of what plaintiffs claimed they were entitled to. Just one second. No question. Judge Gould, any additional questions? No more questions for me. All right, counsel. I think you're out of time. Thank you very much for your presentation. Thank you, your honors. Thank you, your honors. I'd just like to address two points. The first is that your process really matters. I understand your honor says that the reversion dictates that they weren't getting a disproportionate fee anymore, but in McKinney-Droveness, that situation happened exactly there. There, the judge cut the fees and said, at least it's not disproportionate. And the court said, no, that's not good enough. You have to explain why the reversion is in the benefit of the class. And secondarily, in this through line of these cases, it dictates that if the court does not investigate and address and explain- There's no case that says exactly that, is there? If you take all the cases together, I believe that's the through line. There's no case where the court has failed to address these factors and been approved, or affirmed, rather, your honor. Every single one of these cases, they've reversed. But address is the magic word there, counselor. And his opinion is very careful and addresses the factors, just not as widely as you'd like them addressed. No, your honor. Throughout, in every single one of his opinions, he never mouths the words clear sailing, disproportionate fee, reversion. Those words never come up in any of his opinions. He did not address it at all. And in McKinney-Droveness, again, and Allen v. Badola, you can say, I am applying the heightened standard under Bluetooth, and I don't think there's collusion, and that is not good enough. Those courts have been uniformly reversed every single time. Dowd's Old, could you please explain to me, in your words, why your clients think the settlement was not fair, reasonable, and adequate? Yes, your honor, I'd be happy to. Under this settlement, Missouri residents get almost nothing. At best, it's a few hundred thousand dollars. Their total aggregate damages, even for just residential purchases, is probably around $50 million. And, second, and the court never addressed the importance of class certification. Under Monsanto's own argument today, they said we did not reach a settlement until June. And that's why we notified the court in June. Our class was certified well before that, and would have been able to get a common benefit fund for their full damages. Oh, sorry, and one other point. I understand that the court is concerned that under this settlement, class members receive something like two-thirds of their damages, but they made that exact same argument in McKinney-Drobeness. There, Mr. Boutros argued, class members are getting 90% under this claims-made settlement, and the court rejected that and said that's not good enough because it is a claims-made settlement, and most people get absolutely nothing. Thank you, Your Honors. All right. Thank you. Thank you, Counsel. A matter of Gilmour v. Fontana v. Tomlinson and Richardson will be submitted at this time. We appreciate very much your arguments today, and with that, we will be in recess. All rise. Court for this session stands in recess.
judges: GOULD, SMITH, MENDOZA